Jeffrey Lewis (SBN 66587)
Benjamin Gould (SBN 250630)
KELLER ROHRBACK L.L.P.
300 Lakeside Drive, Suite 1000
Oakland, CA  94612
Phone (510) 463-3900, Fax (510) 463-3901
jlewis@kellerrohrback.com
bgould@kellerrohrback.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| DAVID COTTRELL,<br><br>Plaintiff,<br><br>v.<br><br>AT&T INC., PACIFIC BELL TELEPHONE CO.<br>d/b/a AT&T CALIFORNIA, and DIRECTV, LLC,<br><br>Defendants. | No. 3:19-cv-07672-JCS<br><br><br>**PLAINTIFF'S FIRST AMENDED CLASS<br>ACTION COMPLAINT**<br><br>(DIVERSITY JURISDICTION – CLASS<br>ACTION FAIRNESS ACT) |

**TABLE OF CONTENTS**

I.  INTRODUCTION ...........................................................................................................1

II.  JURISDICTION AND VENUE ......................................................................................5

III.  PARTIES .........................................................................................................................5

IV.  FACTUAL ALLEGATIONS ...........................................................................................6

  A.  AT&T's Practice of Opening or Activating Unauthorized Accounts,
      Services, and Products. .......................................................................................6

  B.  AT&T's Arbitration Provisions Violate California Law and
      Are Unenforceable. ...........................................................................................15

V.  CLASS ACTION ALLEGATIONS ...............................................................................19

VI.  CLAIMS .........................................................................................................................22

  FIRST CLAIM Asserted on Behalf of Plaintiff and the Class:  Violation of
      California's Consumer Legal Remedies Act  (Cal. Civ. Code § 1750 *et seq.*) ....22

  SECOND CLAIM Asserted on Behalf of Plaintiff and the Class:  Violations of
      California's Unfair Competition Law  (Cal Bus. & Prof. Code § 17200 *et seq.*)..24

  THIRD CLAIM Asserted on Behalf of Plaintiff and the Class:  Violations of
      California Consumer Records Act  (Cal. Civ. Code § 1798.80 *et seq.*)...............25

  FOURTH CLAIM Asserted on Behalf of Plaintiff and the Class:  Unjust Enrichment ...26

  FIFTH CLAIM Asserted on Behalf of Plaintiff and the Class:  Conversion....................27

  SIXTH CLAIM Asserted on Behalf of Plaintiff and the Class:  Declaratory Relief ........27

VII.  PRAYER FOR RELIEF .................................................................................................28

VIII.  DEMAND FOR JURY TRIAL.......................................................................................29

Plaintiff David Cottrell brings this action on behalf of himself and all other similarly situated individuals in the State of California who have been or will be victimized by AT&T's deceitful practice of opening and charging people for unauthorized accounts, services, and products. Plaintiff seeks the following relief: a public injunction, including a permanent injunction of Defendants' misconduct, the creation of a mechanism for monitoring same, a public accounting, the invalidation of any unauthorized accounts, services, and products, and robust notice to the Californians victimized by AT&T; other equitable relief, including restitution; a declaratory judgment that AT&T's arbitration provisions are unenforceable, that AT&T's misconduct violated California law, and that AT&T is liable to Plaintiff and the Class; and compensatory and punitive damages.[1] Plaintiff also demands a jury trial for all claims properly triable thereby, and complains and alleges as follows:

## I.      INTRODUCTION

1.      Across California, AT&T Inc.—and its subsidiaries Pacific Bell Telephone Co. and DirecTV, LLC (collectively, "AT&T")—are deceitfully opening and charging people for unauthorized accounts, services, and products. Anyone who walks into one of AT&T's 613 stores in the state[2] is a potential target, but so are existing AT&T customers, like Plaintiff Cottrell.

2.      In September 2018, Plaintiff Cottrell, a California resident who lives in Contra Costa County, expressly told multiple AT&T employees that he was not interested in opening the DirecTV Now[3] account they were pushing on him when he called to discuss his AT&T U-verse cable service.

---

[1] Plaintiff Cottrell has complied with California's Civil Code § 1782's notice requirements prior to seeking damages under the CLRA because, more than 30 days ago, he filed his original complaint seeking injunctive relief and sent notice to Defendants about their alleged violations of the CLRA.

[2] *See 613 AT&T Stores in California*, AT&T, https://www.att.com/stores/california (last visited Jan. 31, 2020).

[3] DirecTV Now was a streaming service that allowed users to access live TV and On Demand titles, "anytime, anywhere, all on your favorite devices," such as smart phones, laptops, and tablet devices. *Get More TV Freedom*, DirecTV Now (Aug. 1, 2019). https://www.directvnow.com [https://web.archive.org/web/20190801002710/https://www.directvnow.com/]. AT&T recently rebranded DirecTV Now as AT&T TV Now, which likewise offers live TV and On Demand titles,

Plaintiff Cottrell even complained to an AT&T supervisor about how aggressively the company tried to sign him up for the unwanted account. Months later, Plaintiff Cottrell was shocked to discover that AT&T had signed him up anyway and charged him hundreds of dollars—all for a DirecTV Now account he did not want, did not authorize AT&T to open, and did not use.

3.    AT&T customers and employees have been reporting similar misconduct across the state and across the country.

4.    There have also been reports of similar misconduct in Hawaii, where AT&T employees at an AT&T store attempted to blow the whistle on AT&T's practice of opening unauthorized accounts using people's credit card information. AT&T has also reportedly victimized people in Alaska, Oregon, Arizona, Illinois, and North Carolina.

5.    Unfortunately, this kind of misconduct is nothing new for AT&T, which has a long history of deceiving consumers and charging them for accounts, services, and products without their knowledge and against their will. In 2014, AT&T agreed to a $105 million settlement with federal and state investigators—including $80 million in consumer refunds—for illegal billing practices going back to 2009.[4] The illegal billing practice at issue then, known as "mobile cramming," occurred when "payments to third parties for special wireless services are added to phone bills and often go undetected by customers for months."[5] Tom Wheeler, then-chairman of the Federal Communications Commission, declared triumphantly: "It stops today for AT&T."[6] Wheeler and the FCC were overly optimistic.

---

"anytime, anywhere, on all your favorite devices." *See Get More TV Freedom*, AT&T TV Now, https://www.atttvnow.com (last visited Jan. 31, 2020).

[4] Jim Puzzanghera, *AT&T to Pay $105 Million to Settle 'Mobile Cramming' Cases*, L.A. Times (Oct. 8, 2014), https://www.latimes.com/business/la-fi-att-cramming-20141009-story.html.

[5] *Id.*

[6] Bill Donahue, *AT&T Pays $105M To FTC, FCC, AGs Over Mobile Cramming*, Law360 (Oct. 8, 2014), https://www.law360.com/telecom/articles/585548/at-t-pays-105m-to-ftc-fcc-ags-over-mobile-cramming.

6.      AT&T has boldly resumed similar misconduct over at least the past three years. But whereas the misconduct above was perpetrated by AT&T's use of third parties, AT&T now uses its own subsidiaries, like DirecTV, which AT&T acquired in 2014.[7]

7.      AT&T's shareholders recently alleged, in a securities fraud class action, that AT&T artificially inflated its DirecTV Now subscriber numbers by fraudulently creating DirecTV Now accounts.[8] These allegations date back to 2016 and possibly even earlier, name multiple AT&T executives as defendants, and are based on information provided by 18 confidential witnesses— current and former AT&T employees from around the country, including California, and from all levels within the company. AT&T employees report that AT&T set DirecTV Now sales quotas that "incentivized . . . aggressive and improper sales tactics" for their sales representatives,[9] *i.e.*, those AT&T employees who interact most directly with all the people who walk into an AT&T store or call AT&T to discuss a service, product, or promotion that they have recently seen AT&T advertise on TV or the internet.

8.      AT&T's employees report feeling "intense pressure" to "sell" DirecTV Now accounts, and indicate that this pressure resulted in sales associates resorting to "unnatural sales or flat out fraudulent" sales.[10] These reports are likely just the tip of the iceberg of AT&T's recent misconduct, most of which likely stemmed from AT&T's need to start turning a profit following the costly acquisitions of DirecTV and Time Warner in 2014 and 2016, which cost AT&T hundreds of billions

---

[7] Thomas Gryta, *AT&T Closes $49 Billion DirecTV Buy*, Wall St. J. (July 24, 2015) https://www.wsj.com/articles/at-t-closes-49-billion-directv-acquisition-1437766932.

[8] Rachel Sandler, *AT&T Sued for Allegedly Creating Fake DirecTV Now Accounts*, Forbes (Sept. 16, 2019), https://www.forbes.com/sites/rachelsandler/2019/09/16/att-sued-for-inflating-subscriber-numbers-by-allegedly-creating-fake-directv-now-accounts/#7cf975981767.

[9] *See* Am. Consol. Class Action Compl. ("Sec. Compl.") ¶¶ 17, 206, 209, 211, *Gross v. AT&T Inc.*, No. 19-2892 (S.D.N.Y. Sept. 13, 2019), ECF No. 79.

[10] *Id.*

of dollars.[11]

9.      While AT&T is currently facing investor scrutiny and litigation for some of its misconduct, AT&T has managed to avoid serious public inquiry from anyone else. This lack of public inquiry is not for lack of trying on the part of AT&T's customers, as evidenced by the volume of AT&T customer complaints. The likely reason such complaints have not precipitated a serious public inquiry is that AT&T's robust arbitration provisions, to which it requires all its customers to submit, mandate arbitration but prohibit the arbitrator from providing non-individual injunctive relief. This means that the AT&T's customers cannot seek, and the arbitrator cannot provide, public injunctive relief, *i.e.*, relief that would inform the general public about, and protect it from, the threat posed by AT&T's misconduct.

10.     Under the terms of AT&T's arbitration provisions, it is this Court's task to determine their scope and enforceability. And, thankfully for the people of California, AT&T's arbitration provisions are unenforceable in this state according to the California Supreme Court and the Ninth Circuit. Under California law, any contract that waives a party's statutory right to seek public injunctive relief is unenforceable. AT&T's arbitration provisions, including the one at issue for this litigation, mandate arbitration but prohibit the arbitrator from providing non-individual injunctive relief. This effectively bars the arbitrator from providing public injunctive relief, too, because if the arbitrator cannot provide injunctive relief beyond the individual, the arbitrator certainly cannot provide injunctive relief to the general public.

11.     AT&T's arbitration provisions barring non-individual injunctive relief also contain a clause stating that if a court finds any part of the arbitration provision barring non-individual injunctive relief unenforceable, the entire arbitration provision is null and void.

---

[11] AT&T paid a reported $67.1 billion for DirecTV and $85.4 billion for Time Warner. *Id.* ¶¶ 97, 124.

12.     This Court should find that AT&T's arbitration provisions are unenforceable as a matter of law and are null and void under their own terms. Consequently, Plaintiff Cottrell can bring all of his claims against AT&T related to its misconduct in opening or activating unauthorized accounts, services, or products, in this Court. This obviously includes his claims seeking public injunctive relief under the CLRA, UCL, and California Consumer Records Act. It also includes his individual and class claims on behalf of his fellow Californians.

## II.     JURISDICTION AND VENUE

13.     As alleged in Defendants' Notice of Removal, this Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d) because the putative class includes at least 100 persons, the parties are minimally diverse, and the amount in controversy exceeds $5,000,000.

14.     This Court has personal jurisdiction over the parties because Plaintiff's claims all arise out of Defendants' substantial and purposefully directed contacts with residents of the State of California, and multiple Defendants are headquartered in the State of California, including Pacific Bell Telephone Co. and DirecTV, LLC.

15.     Venue is proper under 28 U.S.C. § 1391 because Plaintiff at all relevant times lived and was an AT&T customer in Contra Costa County, located in this judicial district, and because a substantial part of the events giving rise to his claim occurred in this judicial district.

## III.     PARTIES

16.     Plaintiff David Cottrell is a citizen of California who resides in Contra Costa County. During the relevant time period, he was an AT&T customer who maintained an AT&T U-verse cable-service account with AT&T, likely through AT&T subsidiary, Pacific Bell Telephone Co., the AT&T cable service provider for the State of California.

17.     Defendant AT&T Inc. is a Delaware corporation with its principal place of business in Dallas, Texas. AT&T Inc., through its subsidiaries and affiliates—such as Pacific Bell Telephone Co.

and DirecTV, LLC—provides local and long-distance phone services, wireless and data communications, internet access, and IP-based and satellite television to Californians. AT&T's "entertainment division" (a.k.a. "Xandr"), which was responsible for implementing and monitoring the implementation of AT&T's DirecTV Now application, is located in El Segundo, California.[12]

18.    Defendant Pacific Bell Telephone Co. (a.k.a. "AT&T California") is a California corporation with its principal place of business in San Francisco, California. Pacific Bell Telephone Co. is a subsidiary of AT&T Inc. that provides telecommunication services, including broadband services such as AT&T U-verse, to California residents like Plaintiff Cottrell.

19.    DirecTV, LLC is a California corporation. DirecTV's principal place of business is in El Segundo, California. DirecTV, LLC is a subsidiary of AT&T Inc. and provides visual and textual television programs on a subscription or fee basis, including streaming services like DirecTV Now. DirecTV, LLC is also located in El Segundo, California.

20.    Each Defendant is a "person" within the meaning of the California Business and Professional Code § 17201.

21.    Collectively, the Defendants are referred to herein as "AT&T."

## IV.    FACTUAL ALLEGATIONS

### A.    AT&T's Practice of Opening or Activating Unauthorized Accounts, Services, and Products.

22.    The deceitful practice at issue in this case works as follows. An existing AT&T customer or a potential AT&T customer walks into one of AT&T's 613 stores or calls AT&T to discuss an account, service, or product. This likely occurs after the person has seen one of AT&T's

---

[12] *See Get a Peek Inside AT&T Entertainment Group's El Segundo, CA Headquarters*, AT&T Careers, https://www.att.jobs/article-att-entertainment-group-headquarters (last visited Jan. 31, 2020).

countless advertisements, on which AT&T spends over $5 billion annually.[13] An AT&T employee at the store or on the phone, under tremendous pressure by management to meet unrealistic sales goals, tries to sell the person some other product, account, or service. The person is not interested, but the AT&T employee persists. The person again says no, fully believing that he or she will not be signed up for the product. But then the AT&T employee signs the person up anyway. Months later, the person discovers that he or she is being charged by AT&T or one of its subsidiaries for an account or service they did not authorize. That is precisely what happened to Plaintiff Cottrell.

23.     Plaintiff Cottrell first discovered that AT&T had opened and charged him for an unauthorized DirecTV Now account in March 2019, six months and hundreds of dollars after AT&T initially opened and charged him for the unauthorized DirecTV Now account.

24.     As of September 2018, Plaintiff Cottrell had been using AT&T's U-verse broadband internet service for about four years. Plaintiff Cottrell had grown concerned about the cost of AT&T's U-verse service generally, so he decided to call AT&T to see if AT&T had any promotions that would lower the cost of the service. Plaintiff Cottrell was put in touch with an AT&T customer service agent. Almost immediately, the customer service agent began pitching DirecTV Now to Plaintiff Cottrell, who repeatedly and adamantly said that he was not interested. Eventually, Plaintiff Cottrell got so frustrated that he demanded to talk to an AT&T supervisor. The supervisor did not tell Plaintiff Cottrell why an AT&T customer service agent had made such a strong sales pitch for DirecTV Now, but apologized for the conduct and supposedly secured Plaintiff Cottrell a discount on

---

[13] Ivan De Luce, *10 Companies That Spent More Than $1 Billion in Ads So You'd Buy Their Products*, Bus. Insider (Oct. 4, 2019), https://www.businessinsider.com/10-biggest-advertising-spenders-in-the-us-2015-7; AT&T Inc., Annual Report (Form 10-K) (Feb. 20, 2019), https://otp.tools.investis.com/clients/us/atnt2/sec/sec-show.aspx?Type=html&FilingId=13241251&CIK=0000732717&Index=10000.

his AT&T U-verse package. Plaintiff Cottrell ended the conversation firmly believing that he had not been signed up for a DirecTV Now account.

25.     Imagine Plaintiff Cottrell's surprise when he discovered, six months later in March 2019, that he had been charged hundreds of dollars for a DirecTV Now account. Plaintiff Cottrell did not discover the charges on his AT&T bill, as one might expect. Instead, he discovered the unauthorized charges on his Bank of America Visa bill. But discovering the unauthorized charges was only the beginning of the battle—it took Plaintiff Cottrell two more months to finally cancel the unauthorized account and get reimbursed for the approximately $400 in unauthorized charges. But neither AT&T nor DirecTV reimbursed Plaintiff Cottrell.

26.     As a first step, Plaintiff Cottrell had to cancel multiple credit cards to get the unauthorized charges to stop appearing. Then Bank of America's fraud department reimbursed Plaintiff Cottrell for the unauthorized charges. But that reimbursement didn't come from the actual perpetrators and did not compensate Plaintiff Cottrell for the time and energy he was forced to spend closing the unauthorized account. Nor did the reimbursement explain why AT&T did what it did, what kind of programs AT&T has in place that create this kind of misconduct, how much AT&T knows about this misconduct, how many other AT&T customers have been victimized by similar misconduct, or how Plaintiff Cottrell's fellow Californians can be protected from the threat posed by AT&T's misconduct in the future. The threat posed to current and potential AT&T customers is real because much of the misconduct occurs at one of AT&T's 613 stores in the state.

27.     A former AT&T store employee reports that while he worked at an AT&T store in California, his store management consistently pressured him and his coworkers to meet unrealistic sales goals and engage in unethical sales practices related to the certain AT&T products and services, including but not limited to the DirecTV Now streaming service and business accounts. Employees had monthly targets that they were penalized for failing to reach. Employees were taught by

management how best to deceive people and create unauthorized accounts using people's credit card information and fake email addresses. The former employee also makes it clear that while his fellow AT&T employees would target anyone who walked into an AT&T store, they focused much of their misconduct on the more vulnerable members of the population, including elderly Californians.

28.     When an elderly Californian walked into an AT&T store to discuss some product or service, AT&T employees would tell them that they were entitled to three "free" months of DirecTV Now. AT&T employees would not tell the visitors that they would eventually be charged for the accounts if they were not canceled after three months. Accordingly, some people agreed to try DirecTV Now under false pretenses. Others declined. But regardless of whether the people were interested or agreed to be signed up for an account, if they were already AT&T customers, AT&T store employees would use the person's credit card information and create fake emails to activate unauthorized accounts. Eventually, some people would discover the unauthorized charges and come back into the store to complain. But that was often months later. Plus, there were various loopholes that AT&T stores would use to decline refunds, such as capping the amount of refunds a given store could authorize. This kind of misconduct, according to the former employee, was not limited to just his AT&T store; it was a statewide problem.

29.     People have reported similar misconduct by AT&T in Alaska, Arizona, Hawaii, Oregon, Illinois, and North Carolina. A married Oregon couple, for example, discovered in January 2019 that they had been signed up and charged for an unauthorized DirecTV Now account despite stating that they weren't interested. This occurred after they called AT&T to change the husband's data plan. The wife was subjected to an intense sales pitch for DirecTV Now—a sales pitch she had declined. It took nearly six months to discover they had been improperly signed up for an account, and a month to finally get someone at AT&T to cancel the unauthorized account. AT&T refunded only one month of the five months of unauthorized charges.

30.     In North Carolina, "msparish"—likely an AT&T customer—posted the following complaint on an AT&T-run internet forum in February 2019:[14]

> Directv Now continues to withdraw money from my account although stop payment was made by my bank and debit card was changed. I never signed up with Directv Now. I am baffled how payment information was received. The phone number provided is bogus. I signed up in June with Direct Tv/AT&T. Neither of them is willing to help resolve issue (*see* link https://www.attsavings.com/directv/directv-now). Can someone recommend how to correct problem?

> Another likely AT&T customer—"beww357," from Wyoming—responded to msparish's post by writing, "As for how they got the payment information, been to an AT&T store recently?"[15] This suggests that AT&T's customers believe that the place where AT&T likely got msparish's or any customer's credit card information to open an unauthorized account was at an AT&T store. This belief is consistent with AT&T's reported misconduct in Hawaii, as reported by former AT&T employees, and consistent with the allegations in the securities fraud class action recently filed in New York. And, again, AT&T has 613 stores in the state of California alone.

31.     According to a June 2018 news article from Hawaii, former AT&T employees at various AT&T stores in Hawaii reported that AT&T store managers encouraged them to use "unethical sales tactics" to sell "trial" DirecTV Now subscriptions, and then hypocritically fired the employees for doing so.[16] One former employee, who wished to remain anonymous, said that "[t]hese customers are seeing charges on their statements that they have no clue what it is, but managers are forcing us to do it because they need to meet their quotas."[17] According to the article, AT&T stores

---

[14] *Unauthorized Charges by Direct Now*, AT&T Community Forums (Feb. 12, 2019), https://forums.att.com/t5/DIRECTV-NOW-Account-Billing/Unauthorized-charges-by-Direct-Now/td-p/5806181 (sic throughout).

[15] *Id.*

[16] Austin Westfall, *Hawaii AT&T Workers Say Company Urged Them to Use Unethical Tactics–and Then Fire Them*, Hawaii News Now (Aug. 13, 2018), https://www.hawaiinewsnow.com/story/38480635/hawaii-att-workers-say-company-urged-them-to-use-unethical-tactics-and-then-fired-them/.

[17] *Id.*

and managers pressured employees to sign people up for DirecTV Now accounts because they were a ranked and important sales metric: DirecTV Now accounts generate more profits for AT&T and their stores because they generate larger profit margins than, for example, cell phones, which "do not pull a large profit for AT&T stores."[18] Also, AT&T executives were under pressure to justify and turn a profit following AT&T's expensive acquisitions of DirecTV and Time Warner.

32.     Another former employee, Abraham Buonya,[19] said that "[t]he managers basically encouraged us and informed us of how to manipulate sales."[20] According to Mr. Buonya, one of the manipulative sales practices encouraged by management involved AT&T sales representatives signing people up for supposedly free "trials" of DirecTV Now and offering to cancel the account before it turned into a regular subscription that began charging the customer. Unfortunately for AT&T's customers, the sales reps would then let some of the trials "slip[] through the cracks," "which meant customers would be charged for months of DirecTV Now service."[21] Another AT&T employee, who wished to remain anonymous, said he had "seen some customers not catch the charges for up to seven months."[22]

33.     According to the same 2018 news article, it is also likely that AT&T sales representatives opened multiple unauthorized DirecTV Now accounts on behalf of unknowing AT&T customers, using the customers' credit cards. According to another AT&T store employee, who wished to remain anonymous, "My manager picked up my [work] iPad, which was signed in under me, made a fake email and then activated a Direct TV Now subscription on that email and then said if

---

[18] *Id.*

[19] Prior to being fired, Mr. Buonya was AT&T's "top salesman in the state for two years." *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

I can do it, here you go, you can do the next one."[23]

34.     AT&T responded to the investigation that prompted the above news article by firing a few store-level employees, reimbursing a handful of customers, and asserting that AT&T had taken "'appropriate action.'"[24] While such "appropriate action" may have fixed things at one store in Hawaii, it does not fully account for AT&T and its employees' misconduct or the alleged pressure from management to hit sales quotas by signing people up for multiple unauthorized accounts. Nor did AT&T's "appropriate action" do anything for the AT&T customers in California who were similarly victimized by AT&T's practice of opening unauthorized accounts and services. Nor does AT&T's "appropriate action" do anything to protect Californians who see an AT&T advertisement and decide to call or go into one of AT&T's 613 stores in the state. Nor will these issues be addressed by the recent securities fraud case against AT&T.

35.     In that securities fraud case, AT&T shareholders allege that AT&T artificially inflated its DirecTV Now subscription numbers and defrauded investors. The allegations in that complaint, which are based on public statements by AT&T executives and the assertions of 18 confidential witnesses, shed light on the motives for AT&T's rampant misconduct.

36.     What likely motivated AT&T's misconduct in California and beyond? AT&T's need to appease its shareholders following two very expensive acquisitions. In 2014, AT&T spent $67.1 billion to acquire a struggling satellite TV provider, DirecTV.[25] In 2016, AT&T spent $85.4 billion to acquire media giant Time Warner.[26] As a result, AT&T began 2016 as the second most indebted company listed on the S&P 500. AT&T's justification for these two very expensive acquisitions was DirecTV Now.

---

[23] *Id.*
[24] *Id.*
[25] *See supra* note 11.
[26] *Id.*

12                    PLAINTIFF'S FIRST AMENDED
                                                                                    CLASS ACTION COMPLAINT

37.     On October 25, 2016—three days after AT&T announced the expensive Time Warner acquisition—AT&T's CEO, Randall L. Stephenson, made it clear that the acquisition of Time Warner was "about" launching DirecTV Now, which would be a "game changer" for AT&T and the marketplace.[27]

38.     DirecTV Now would allow users to download an application onto their smart phone or tablet device that would allow the user to "stream" live TV, as well as on-demand "premium" content like HBO. This meant that users didn't need to buy—and AT&T didn't need to provide—expensive cable or satellite equipment. And this would be a "game changer" for AT&T and its subsidiaries because it would allow AT&T to pursue a reported "20 million" consumers that AT&T and DirecTV had lost over the years.[28]

39.     But DirecTV Now didn't turn out to be the "game changer" that Stephenson had hoped for. And rather than focus on improving the quality or lowering the price of the product to drive subscriptions, AT&T focused on sales—effectively sacrificing its customers to appease its shareholders.

40.     AT&T employees allege that AT&T set DirecTV Now sales quotas that "incentivized . . . aggressive and improper sales tactics," that there was an "extraordinary amount of pressure on [AT&T] employees to push sales of DirecTV Now," and that this pressure resulted in sales associates resorting to "unnatural sales or flat-out fraudulent" sales.[29]

41.     One AT&T employee reported that he was "taught to manipulate" sales of DirecTV Now when activating new mobile phones for customers.[30] According to this employee, when a wireless customer would come into the store to upgrade his or her phone and get a new one, the

---

[27] Sec. Compl. ¶ 125.

[28] *Id.*

[29] *See id.* ¶¶ 17, 206, 209, 211.

[30] *Id.* ¶ 171.

13

customer traditionally had to pay an "activation fee."[31] After the launch of DirecTV Now, the employee and his colleagues were taught to convert the activation fee into up to three subscriptions of DirecTV Now and covertly waive the activation fee.[32] A customer that upgraded his or her phone was thereby subscribed, without authorization, to DirecTV Now.

42.     Another AT&T employee reported that the employees would try to pitch DirecTV Now, but it was a "very hard sell," and that sometimes the person would say that he or she did not want the product, but the employee would go ahead and add it to the account anyways.[33] Not surprisingly, AT&T customers would come back into the retail stores to complain about charges related to these unauthorized accounts. This employee estimated that 40-50% of the customers he dealt with in early 2017 were complaining about such charges.[34]

43.     Multiple AT&T employees in California reported similar misconduct.[35] One AT&T employee, a store manager in California, reported that there were other managers who were signing customers up for DirecTV without their knowledge.

44.     While AT&T employees were busy opening and charging AT&T customers for these unauthorized DirecTV Now accounts, AT&T executives were reporting soaring subscription numbers to investors.[36] At its peak in 2018, AT&T reported nearly 2 million DirecTV Now subscriptions.[37]

---

[31] *Id.*

[32] *Id.*

[33] *Id.* ¶177.

[34] *Id.* ¶ 178.

[35] *Id.* ¶¶ 81, 91, 196, 510

[36] *Id.* ¶ 31.

[37] Also, AT&T executives have repeatedly bragged about just how much user and/or account-specific data they have, including who's watching and what they're watching. *Id.* ¶¶ 221, 222, 225, 226, 234, 381, 388; Georg Szalai, *AT&T Executive on DirecTV Now's First Six Months of "Disrupting the Market"*, Hollywood Rep. (May 31, 2017), https://www.hollywoodreporter.com/news/at-t-executive-directv-nows-first-six-months-disrupting-market-1008351. This data can be used to easily identify which accounts were unauthorized.

1   Hundreds of thousands of these subscriptions were likely unauthorized, forcing hundreds of

2   thousands of AT&T "customers" to pay charges related to these unauthorized accounts. But so far,

3   AT&T has avoided serious public scrutiny of this misconduct, likely due to its robust but (in

4   California) unenforceable arbitration provisions.

5   **B.     AT&T's Arbitration Provisions Violate California Law and Are Unenforceable.**

6         45.     AT&T's arbitration provisions all violate California law and are thereby unenforceable

7   against the citizens of California and/or anyone victimized by AT&T's conduct within the State.

8         46.     In *McGill v. Citibank*, N.A, 2 Cal. 5th 945 (2017), the California Supreme Court made

9   it clear that any contract provision waiving a person's right to seek public injunctive relief is

10  unenforceable as a matter of law. This rule—called the *McGill* Rule—was recently found by the

11  Ninth Circuit to be consistent with both Supreme Court precedent and the Federal Arbitration Act.

12  *See Blair v. Rent-A-Center, Inc.*, 928 F.3d 819 (9th Cir. 2019).

13        47.     AT&T's arbitration provisions all violate the *McGill* Rule because they mandate

14  arbitration but prohibit the arbitrator from providing non-individual injunctive relief. By definition,

15  barring an arbitrator from providing non-individual injunctive relief prevents the arbitrator from

16  providing any public injunctive relief, *i.e.*, injunctive relief that would benefit the general public more

17  broadly, like a forward-looking injunction aimed at protecting consumers generally, not just AT&T's

18  existing customers. Further, under the terms of AT&T's arbitration provisions, if a court finds that the

19  particular provision barring public injunctive relief is unenforceable, the entire arbitration provision is

20  null and void thanks to a "nonseverability" clause.

21        48.     Finally, this Court is free to determine the enforceability of AT&T's arbitration

22  provisions because, under their terms, "issues relating to the scope and enforceability of the

arbitration provision are for the court to decide."[38]

49.     AT&T's U-verse arbitration provision in its agreement with its customers—the arbitration provision to which Plaintiff Cottrell would be subject if it were enforceable—violates the *McGill* Rule because it mandates arbitration but prohibits the arbitrator from providing non-individual injunctive relief. It thereby bars Plaintiff Cottrell from seeking—and the arbitrator from granting—public injunctive relief. AT&T's U-verse arbitration provision limits the available injunctive relief to merely individual injunctive relief as follows:[39]

> The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim.

This provision clearly violates the *McGill* Rule and is, therefore, unenforceable as a matter of law. Further, applying this arbitration provision would violate *McGill* because Plaintiff Cottrell seeks robust injunctive relief under the CLRA, UCL, and California Consumer Records Act, as detailed below, including a permanent injunction against the alleged misconduct, the creation of a monitoring mechanism designed to prevent the misconduct from reoccuring, and robust notice to all those Californians whom have already been victimized by this misconduct, many of whom likely have no idea that AT&T has injured them in the past and may injure them in the future.

50.     AT&T's U-verse arbitration provision also contains a nonseverability clause. Under the terms of the specific provision barring non-individual injunctive relief, "if [the] specific provision [limiting the available injunctive relief] is found to be unenforceable, *then the entirety of this arbitration provision shall be null and void*."[40] So, if this Court finds that the AT&T U-verse arbitration provision's limitation on injunctive relief is unenforceable under *McGill*, the arbitration

---

[38] *AT&T U-verse TV and AT&T Phone General Terms of Service* § 11.c, AT&T (Jan. 2019), https://www.att.com/legal/terms.uverseandphoneAttTermsOfService.html.

[39] *Id.* § 11.f.

[40] *Id.* (emphasis added).

1   provision as a whole is null and void. Plaintiff Cottrell would therefore be free to bring any and all

2   disputes with, and claims against, AT&T in this court, including not only his claims for public

3   injunctive relief and declaratory relief, but also his class claims.

4       51.   Most of AT&T's arbitration provisions also violate the *McGill* Rule, are unenforceable

5   as a matter of law, and are null and void under their own nonseverability clauses:[41]

| Title and Service(s) | Relevant Entities | Scope/Enforce-ability | Unenforceable Under *McGill* | Nonseverability Clause |
|---|---|---|---|---|
| Wireless Customer Agreement | AT&T Mobility LLC and its affiliates | **Court Decides:** "issues relating to the scope and enforceability of the arbitration provision are for the court to decide" (§ 2.2.3) | **Violates *McGill*:** "The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim." (§ 2.2.6) | **Null and Void:** "If this specific provision [2.2.6] is found to be unenforceable, then the entirety of this arbitration provision shall be null and void." (§ 2.2.6) |
| AT&T Digital Life Customer Agreement Summary (home security) | AT&T Digital Life, Inc. and respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns. | **Court Decides:** "issues relating to the scope and enforceability of the arbitration provision are for the court to decide" (§ 22.2) | **Violates *McGill*:** "The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim." (§ 22.5) | **Null and Void:** "If this specific provision [22.5] is found to be unenforceable, then the entirety of this arbitration provision shall be null and void." (§ 22.5) |
| AT&T ConnecTech Terms of Service | AT&T ConnecTech services including | **Court Decides:** "issues relating to the scope and enforceability of | **Violates *McGill*:** "The arbitrator may award declaratory or injunctive relief | **Null and Void:** "If this specific provision [X.B(6)] is found to be |

---

[41] *Legal Policy Center*, AT&T, https://www.att.com/legal/legal-policy-center.html (last visited Oct. 4, 2019).

| Title and Service(s) | Relevant Entities | Scope/Enforce-ability | Unenforceable Under *McGill* | Nonseverability Clause |
|---|---|---|---|---|
| (home phone) | Remote Support Services | the arbitration provision are for the court to decide" (§ X.B(3)) | only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim." (§ X.B(6)) | unenforceable, then the entirety of this arbitration provision shall be null and void." (§ X.B(6)) |
| AT&T Internet Terms of Service | AT&T provisioned fixed location internet access services including both narrowband and broadband internet access services | **Court Decides:** "issues relating to the scope and enforceability of the arbitration provision are for the court to decide" (§ 13.c) | **Violates *McGill*:** "The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim." (§ 13.f) | **Null and Void:** "If this specific provision [13.f] is found to be unenforceable, then the entirety of this arbitration provision shall be null and void." (§ 13.f) |
| AT&T Wi-Fi Terms of Service | AT&T Wi-Fi Services | **Court Decides:** "issues relating to the scope and enforceability of the arbitration provision are for the court to decide" (§ 3) | **Violates *McGill*:** "The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim." (§ 6) | **Null and Void:** "If this specific provision [6] is found to be unenforceable, then the entirety of this arbitration provision shall be null and void." (§ 6) |

Because AT&T's arbitration provisions are all unenforceable under *McGill* and null and void on their own terms, Plaintiff Cottrell and other AT&T customers are free to bring all of their individual and class claims in this Court.

## V.      CLASS ACTION ALLEGATIONS

52.     This matter is brought by Plaintiff Cottrell on behalf of himself and those similarly situated, under Rule 23 of the Federal Rules of Civil Procedure. Because AT&T's misconduct was uniformly designed and implemented throughout the State of California, uniformly impacted and injured numerous Californians, and, going forward, uniformly threatens any Californian who happens to see one of AT&T's countless advertisements and/or decides to walk into an AT&T store or call AT&T to discuss one of its products, Plaintiff seeks class certification under both Rule 23(b)(2) and (b)(3).

53.     The Class that Plaintiff seeks to represent is defined as follows:

> All persons for whom AT&T or an AT&T employee or agent opened or activated an unauthorized account, service, or product in the State of California.

54.     **Numerosity/Impracticability of Joinder:** the members of the Class are so numerous that joinder of all members would be impractical. The proposed Class likely contains thousands of members, considering that, *e.g.*, AT&T was reporting a heavily inflated 2 million DirecTV Now subscribers as of December 2018.[42] The precise number of class members can be ascertained through discovery, which will include Defendants' data and billing records.

55.     **Commonality and Predominance:** there are common questions of law and fact that predominate over any questions affecting only individual members of the Class.

56.     For Plaintiff Cottrell and the Class, the common legal and factual questions include, but are not limited to the following:

> A.      Whether, as a result of AT&T's misconduct, Plaintiff Cottrell and the Class are entitled to public injunctive relief under the CLRA, UCL, and CCRA, including a permanent injunction, the creation of a monitoring mechanism to prevent similar

---

[42] Sec. Compl. ¶ 31.

misconduct in the future, and robust notice to all of the people in California victimized by AT&T's misconduct;

B.      Whether Plaintiff Cottrell and the Class are entitled to declaratory relief, including a declaration that AT&T's misconduct was unlawful and a declaration that AT&T's arbitration provisions are unenforceable as a matter of law in California;

C.      Whether and how AT&T designed and implemented programs that encouraged and pressured its employees or agents to engage in unlawful practices by signing up people in California for unauthorized AT&T accounts, services, or products;

D.      Whether and how AT&T knew or should have known of its employees' and agents' unlawful practices;

E.      Whether and how AT&T pressured its employees and agents to open and charge people for unauthorized accounts, services, or products;

F.      Whether and how AT&T omitted and concealed material facts from its communications and disclosures to Plaintiff Cottrell and the Class regarding the costs, benefits, and policies of AT&T accounts, services, or products;

G.      Whether and how AT&T engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices with the sale of its accounts and other services;

H.      Whether and how AT&T violated California consumer protection statutes, including the misuse of its customers' credit card information;

I.      Whether and how AT&T has been unjustly enriched or is liable for conversion; and

J.      Whether, as a result of AT&T's misconduct, Plaintiff Cottrell and the Class have suffered damages and, if so, the appropriate amount thereof.

57. **Typicality:** the representative Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff Cottrell and all the members of the Class have been injured by the same wrongful practices of AT&T. Plaintiff Cottrell's claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

58. **Adequacy:** Plaintiff Cottrell is a representative who will fully and adequately assert and protect the interests of the Class and has retained class counsel who are experienced and qualified in prosecuting class actions like this one. For example, in *Jabbari v. Wells Fargo & Co.*, No. 15-2159 (N.D. Cal.), class counsel represented consumers against Wells Fargo related to Wells Fargo's opening of unauthorized accounts. Neither Plaintiff Cottrell nor his attorneys have any interests contrary to or in conflict with the Class.

59. **Superiority:** a class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are likely in the millions of dollars, the individual damages incurred by each Class member are too small to warrant the expense of individual suits. Individual Class members do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual and legal issues. Plaintiff Cottrell and his counsel do not anticipate any difficulty in managing this litigation.

60. **Final Injunctive Relief:** in addition, AT&T has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive and declaratory relief are appropriate, including but not limited to the various forms of public injunctive relief requested below.

21

61.   **Notice:** AT&T has, or has access to, addresses, phone numbers, e-mail addresses, and/or other contact information for the members of the Class, which may be used for the purpose of providing notice of the pendency of this action.

## VI.   CLAIMS

**FIRST CLAIM**
**Asserted on Behalf of Plaintiff and the Class:**
**Violation of California's Consumer Legal Remedies Act**
**(Cal. Civ. Code § 1750 *et seq.*)**

62.   Plaintiff incorporates by reference, every prior and subsequent allegation of this Complaint, as if fully restated here.

63.   California's Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1761(d), protects consumers from "unfair or deceptive acts or practices."

64.   Plaintiff and the Class members are "consumers" within the meaning of the CLRA insofar as Plaintiff and the Class members sought or acquired AT&T's goods and/or services for personal, family, or household purposes.

65.   AT&T's products, merchandise, and services—including its accounts—are "goods" and/or "services" within the meaning of CLRA § 1761(a) and (b).

66.   The transactions set forth in Plaintiff and Class members' allegations against AT&T— including both the transactions Plaintiff and Class members knew and did not know about—are "transactions" within the meaning of CLRA § 1761(e).

67.   AT&T has violated and continues to violate CLRA §§ 1770(a)(9), (13), (14), (17), (18), and (19) by, inter alia, "(9) Advertising goods or services with intent not to sell them as advertised. . . . (13) Making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions. . . . (14) Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law. . . . (17) Representing that the consumer will receive a rebate, discount, or other economic benefit, if the

earning of the benefit is contingent on an event to occur subsequent to the consummation of the

transaction. . . . (18) Misrepresenting the authority of a salesperson, representative, or agent to

negotiate the final terms of a transaction with a consumer. . . . (19) Inserting an unconscionable

provision in the contract."

68.     AT&T's misconduct alleged herein was and is continuing to be undertaken by AT&T

with oppression, fraud, and/or malice, within the meaning of California Civil Code § 3294(c).

69.     Plaintiff and Class members have been damaged by AT&T's misconduct.

70.     Unless enjoined and restrained by a court of law, AT&T will continue to commit the

violations alleged herein with respect to Plaintiff, Class members, and other members of the general

public in the State of California and beyond. Plaintiff therefore seeks a public injunction pursuant to

CLRA § 1780(a)(2):

> A.     Enjoining AT&T from committing future violations of the CLRA;
>
> B.     Requiring AT&T to provide an accounting of all monies obtained from AT&T's California customers pursuant to the unauthorized accounts and services that AT&T opened and charged them for during the applicable limitations period;
>
> C.     Requiring AT&T to give individualized notice to all AT&T's California customers whom AT&T victimized by opening and charging them for unauthorized accounts or services, during the applicable limitations period under the CLRA and applicable California law, including notice to each such customer of his or her rights under same (including his or right to restitution of all monies paid to AT&T);
>
> D.     Requiring AT&T to provide individualized notice to each such customer of the procedures available for enforcing the customer's rights under the CLRA; and
>
> E.     Establishing an effective monitoring mechanism to ensure AT&T's continued compliance with the terms of this injunction.

71.     On behalf of himself and Class members, Plaintiff also seeks compensatory and

punitive damages, restitution, attorneys' fees, costs, and any other relief the Court deems proper as a

result of AT&T's violations of the CLRA.

1
2
3

**SECOND CLAIM**
**Asserted on Behalf of Plaintiff and the Class:**
**Violations of California's Unfair Competition Law**
**(Cal Bus. & Prof. Code § 17200 *et seq.*)**

4       72.     Plaintiff incorporates by reference, every prior and subsequent allegation of this

5   Complaint, as if fully restated here.

6       73.     California's Unfair Competition Law ("UCL"), California Business and Professions

7   Code § 17200 *et seq.*, protects both consumers and competitors by promoting fair competition in

8   commercial markets for goods and services. California's UCL is interpreted broadly and provides a

9   cause of action for any unlawful, unfair, or fraudulent business act or practice. Any unlawful, unfair,

10  or fraudulent business practice that causes injury to consumers falls within the ambit of California's

11  UCL.

12

13      74.     AT&T engages in substantial sales and marketing of its accounts, services, and

14  products within the State of California.

15      75.     AT&T's acts and practices, as described herein, constitute unlawful, fraudulent, or

16  unfair business practices, in that (1) AT&T's uniform misconduct has a tendency to deceive Plaintiff

17  and Class members; (2) AT&T's practices violate numerous statutes as described in this Complaint;

18  (3) any possible justification for AT&T's misconduct is outweighed by the gravity of the

19  consequences to Plaintiff and the Class members; and (4) AT&T's misconduct is immoral, unethical,

20  oppressive, unconscionable, and/or substantially injurious to Plaintiff and Class members.

21

22      76.     AT&T's unlawful, unfair, and fraudulent business acts and practices, as described

23  above, include, but are not limited to, wrongfully opening accounts without customer authorization,

24  starting services without customer approval or authorization, and using customers' credit card

25  information to pay for fees, costs, and other penalties related to accounts and services that AT&T

26  opened without the consent, knowledge, or authorization of Plaintiff and Class members.

27      77.     Plaintiff and Class members have been damaged by AT&T's misconduct.

28

78.     Plaintiff re-asserts the public injunctive relief requested above, but under the UCL.

79.     Plaintiff also requests compensatory and punitive damages, attorneys' fees, costs, and any other relief the Court deems proper as a result of AT&T's violations of the UCL.

**THIRD CLAIM**
**Asserted on Behalf of Plaintiff and the Class:**
**Violations of California Consumer Records Act**
**(Cal. Civ. Code § 1798.80 *et seq.*)**

80.     Plaintiff incorporates by reference, every prior and subsequent allegation of this Complaint, as if fully restated here.

81.     AT&T is a "business" as defined by the California Consumer Records Act ("CCRA"), California Civil Code § 1798.80(a).

82.     Plaintiff and Class members are all "individuals" as defined by CCRA § 1798.80(d) and a "customer" as defined by § 1798.80(c).

83.     The information that AT&T used to open unauthorized accounts and services, as alleged in this Complaint, was "personal information" as defined by CCRA §§ 1798.80(e) and 1798.81.5(d), which includes "information that identifies, relates to, describes, or is capable of being associated with, a particular individual, including, but not limited to, his or her name, signature, Social Security number, physical characteristics or description, address, telephone number, passport number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information." (emphasis added).

84.     AT&T's misuse of that personal information to open or activate unauthorized accounts, services, products, or other "sales" was a "breach of the security system" as defined by CCRA § 1798.82(g).

85.     By failing to immediately notify all affected AT&T customers that their personal information had been misused to open or activate unauthorized accounts, services, or products, AT&T violated CCRA § 1798.82. AT&T's failure to immediately notify customers of that misuse caused Plaintiff and Class members to suffer damages by, for example, forcing them to pay unauthorized charges.

86.     Plaintiff re-asserts under the CCRA the public injunctive relief requested above under the CLRA.

87.     Plaintiff also requests actual and statutory damages, attorneys' fees, costs, and any other relief the Court deems proper as a result of AT&T's violations of the CCRA.

## FOURTH CLAIM
### Asserted on Behalf of Plaintiff and the Class:
### Unjust Enrichment

88.     Plaintiff incorporates by reference, every prior and subsequent allegation of this Complaint as if fully restated here.

89.     As a result of AT&T's unlawful and deceptive actions described above, AT&T was enriched at the expense of Plaintiff and the Class through the charges resulting from accounts, products, and services that AT&T unlawfully and/or deceptively sold to or opened on behalf of customers.

90.     Under the circumstances, it would be against equity and good conscience to permit AT&T to retain the ill-gotten benefits that they received from Plaintiff and the Class, in light of the fact that AT&T used illegal, deceptive, and/or unfair practices to induce or force customers to open, purchase, and/or maintain AT&T accounts, services, and products. Thus, it would be unjust and inequitable for AT&T to retain the benefit without restitution to Plaintiff and the Class for the monies paid to AT&T as a result of the unfair, deceptive, and/or illegal practices.

91.     Further, AT&T's wrongful charges to Plaintiff and Class members for accounts,

services, and products they did not authorize damaged Plaintiffs and Class members in an amount that can be identified through AT&T's records.

92.     Plaintiff and Class members seek restitution for this unjust enrichment.

### FIFTH CLAIM
### Asserted on Behalf of Plaintiff and the Class:
### Conversion

93.     Plaintiff incorporates by reference, every prior and subsequent allegation of this Complaint, as if fully restated here.

94.     Plaintiff and Class members own and have the right to possess the money in their checking, savings, and other accounts.

95.     AT&T interfered with Plaintiff's and Class members' possession of this money by wrongfully charging Plaintiff and Class members for accounts, services, or products, despite the fact that these accounts, services, and products were opened or activated without the consent, knowledge, or authorization of Plaintiff and Class members.

96.     Plaintiff and Class members never consented to AT&T's charges related to accounts, services, and products that Plaintiff and Class members neither opened nor authorized.

97.     Plaintiff and Class members request damages for this conversion.

### SIXTH CLAIM
### Asserted on Behalf of Plaintiff and the Class:
### Declaratory Relief

98.     Plaintiff incorporates by reference, every prior allegation of this Complaint, as if fully restated here.

99.     California Code of Civil Procedure § 1060 *et seq.* provides that "[a]ny person interested . . . under a contract, or who desires a declaration of his or her rights . . . with respect to another, or in respect to, in, over, or upon property . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action . . . in the superior court

for a declaration of his or her rights . . . including a determination of any question of construction or validity arising under the instrument or contract."

100. As described above, this Court has jurisdiction over this matter, and therefore may declare the rights of Plaintiff and the Class.

101. Plaintiff and the Class therefore seek an order declaring the following:

A. AT&T's arbitration provisions are unenforceable under California law;

B. AT&T's practice of opening or activating unauthorized, services, or products is unlawful; and

C. AT&T is liable to Plaintiff and the Class for damages caused by that practice.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class members pray for relief as set forth below:

A. Certification of the action as a class action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative and his counsel of record as Class Counsel;

B. Declaration that AT&T's conduct is unlawful and AT&T is liable to Plaintiff and the Class;

C. Declaration that AT&T's arbitration provisions are unenforceable under California law;

D. Public injunctive relief, including permanently enjoining AT&T from performing further unlawful acts as alleged herein, creating a mechanism for monitoring AT&T's conduct designed to prevent its occurrence going forward, notice to the affected class members, the invalidation of any unauthorized AT&T accounts, services, and products, and an accounting for same;

E. Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendants as a result of the unlawful conduct alleged herein;

F.    Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

G.    Pre-judgment and post-judgment interest on such monetary relief;

H.    The costs of bringing this suit, including reasonable attorneys' fees; and

I.    All other relief to which Plaintiff and Class members may be entitled at law or in equity.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and all others similarly situated, hereby requests a jury trial on any and all claims so triable.

DATED this 3rd day of February, 2020.

**KELLER ROHRBACK L.L.P.**


By: *s/ Benjamin Gould*
    Jeffrey Lewis (SBN 66587)
    Benjamin Gould (SBN 250630)
    300 Lakeside Drive, Suite 1000
    Oakland, CA  94612
    Phone: (510) 463-3900
    Fax: (510) 463-3901
    jlewis@kellerrohrback.com
    bgould@kellerrohrback.com

    KELLER ROHRBACK L.L.P.
    Mark A. Griffin (WSBA #16296)
    Raymond J. Farrow (WSBA #31782)
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101-3052
    Phone: (206) 623-1900
    Fax: (206) 623-3384
    mgriffin@kellerrohrback.com
    rfarrow@kellerrohrback.com

    *Attorneys for Plaintiff*